Filed 11/27/13; pub. order 12/26/13 (see end of opn.; reposted 12/26/13 to add counsel)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PERRY C. BECKLEY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF ADMINISTRATION OF CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,<br><br>    Defendant and Appellant. | A135418<br><br>(Alameda County<br>Super. Ct. No. RG11593721) |

Plaintiff Perry Beckley was a California Highway Patrol (CHP) officer until the CHP determined he was not able to perform the tasks required of an officer. He applied for disability retirement, and the Board of Administration of California Public Employees' Retirement System (CalPERS) denied his application, ruling that Beckley was not disabled from carrying out the duties of the position he had most recently held as a public affairs officer (PAO). Beckley brought a petition for writ of mandate, which the trial court granted. CalPERS has appealed.[1] We shall affirm the trial court's judgment.

---

[1] Although CalPERS filed an election to proceed with an appendix in lieu of a clerk's transcript (Cal. Rules of Court, rule 8.124), CalPERS failed to file an appendix. The only record of the trial court proceedings any party filed was a reporter's transcript. CalPERS also failed to ensure the administrative record was transmitted to this court in a timely manner. Because the factual background of this case is contained in the administrative record, which we arranged to have transmitted to us, we will decide this matter on the merits rather than dismissing it for appellants' failure to provide an adequate record. We remind CalPERS, however, of its obligation to do so. (See *In re*

1

# I.  BACKGROUND

Beckley worked as a CHP officer for approximately 23 years.  In 2003, he sought treatment for wrist and arm pain, which he believed were the result of processing an unusually large number of reports at work.  Later in 2003, Beckley reported that he had hurt his back getting out of his state vehicle.  While he was assigned to patrol duty later that year, he had " 'flare-ups' " of his back condition, was diagnosed with lumbar disc degeneration and sciatica, and was taken off work temporarily on several occasions in 2003 and 2004.

In 2004, Beckley applied for a position as a PAO.  The duties of the position included meeting with local legislators, city managers, and community leaders; speaking to community groups; community outreach programs such as child car seat inspections; and attending community fairs.  Beckley would typically drive a patrol car and wear a uniform when attending outreach events.  He was not assigned a beat to patrol, but when driving in a patrol car in uniform, he was expected to undertake ordinary enforcement actions, and did so on a number of occasions.  The PAO is not a limited duty position, and a PAO could be assigned to perform road duty.  Beckley performed well in his position as a PAO.

In 2006, Beckley was evaluated by a chiropractor, Dr. Erich Parks, in connection with a workers' compensation claim.  Dr. Parks concluded that, as a result of his injuries to his upper extremities and lower back, Beckley could not "continue in his occupation since he has preclusions which cause him to be unable to fulfill the 14 critical activities,

---

*Marriage of Wilcox* (2004) 124 Cal.App.4th 492, 498–499; Cal. Rules of Court, rule 8.120(a).)  On our own motion, we take judicial notice of the records of the superior court in this matter.  (Evid. Code, §§ 452, subd. (d) & 459.)

required by CHP."[2]  Of those tasks, Dr. Parks concluded Beckley was unable safely to extract a 200-pound victim from a vehicle and lift, carry, and drag the victim 50 feet; physically subdue and handcuff a combative subject; change a flat tire; drive for extended periods of time; and run up and down stairs.

Either the State Compensation Insurance Fund or CHP's disability and retirement section reviewed the chiropractor's report, informed Beckley's commanding officer that Beckley " 'could not perform the 14 critical tasks,' " and instructed the commanding officer to " 'send [Beckley] home.' "  The commanding officer did so.  Beckley asked if he could continue to work as a PAO, and was told he could not do so because CHP officers had to be able to perform the 14 critical tasks at any time.  Beckley was sent home on leave, and later took service retirement.

It is undisputed that in his job as PAO, Beckley was not required to perform any of the 14 critical tasks regularly, although he performed a few of the tasks on rare occasions during his time as PAO.

Beckley applied for industrial disability retirement.  At a hearing on his application, Beckley presented evidence from three chiropractors that he was unable to carry out all of the 14 critical tasks.  This evidence included the report of Dr. Parks, who had evaluated Beckley in connection with his workers' compensation claim.  According to Dr. Parks, Beckley had suffered two distinct industrial injuries.  The first involved

---

[2] The administrative record includes a document entitled "California Highway Patrol Officer Task Statements," which lists 14 attributes (such as lower and upper extremity muscle strength, balance, flexibility, agility, and aerobic and anaerobic power and capacity), and samples of tasks that use those attributes, including running up and down stairs; ascending and descending an embankment; crawling/crouching/walking 50 feet; extracting a 200-pound victim from a vehicle and lifting, carrying, and/or dragging the victim 50 feet; exiting a vehicle, sprinting 50 yards, vaulting a three-foot barrier, and running 20 yards up a 40 percent grade; physically subduing and handcuffing a combative subject after a 100-yard chase; changing a flat tire; and driving, standing, or directing traffic for extended periods of time while dressed in full uniform.  These tasks are referred to as the "14 critical tasks."

"cumulative trauma to his upper extremities," including carpal tunnel syndrome. The second was the injury to Beckley's lower back, in which a "chronic degenerative condition . . . was aggravated by a sudden twist when exiting a patrol car." Dr. Parks concluded Beckley had lost approximately half of his pre-injury capacity for fine motor control of his hands and for lifting, and that he "should be precluded from doing heavy lifting, repeat bending or stooping." Dr. Parks believed Beckley's carpal tunnel syndrome was "permanent and stationary," and his low back condition was "most likely permanent and stationary."

Another chiropractor, Dr. Joseph Ambrose, opined in 2005 that Beckley had strained his lower back and his upper extremities in his employment with CHP, and that, "[g]iven [Beckley's] subjective factors of disability and objective findings . . . it is my opinion that this patient should be permanently precluded from heavy lifting, repeated bending, prolonged running, jogging or jarring activities." Later, after reviewing MRI results, he opined that Beckley "cannot perform all of the essential functions of his usual and customary occupation."

The third chiropractor, Dr. Moses Jacob, evaluated Beckley in 2008 and reviewed his medical records. He diagnosed Beckley as suffering from, among other things, chronic back strain, "superimposed over lumbar disc herniation" and "bilateral carpal tunnel syndrome," and concluded that these injuries were caused by his employment as a CHP officer. Objective factors for the spine diagnoses included "[l]imited mobility on extension," "[p]ain on palpation," "MRI findings," and "[p]ositive orthopedic tests." Objective findings to support the upper extremity injury included limited mobility in the right wrist and positive orthopedic and radiographic tests. Dr. Jacob concluded Beckley

4

had a "preclusion from heavy lifting, repeated bending and stooping," and that as a result of his injuries, Beckley "can NOT perform the duties required of a CHP officer."[3]

Dr. Joseph Serra, an orthopedic surgeon, examined Beckley at the request of CalPERS and reviewed his medical records. He concluded Beckley had "[c]hronic musculoligamentous strain lumbar spine," "[m]ild degenerative disc disease L3-4 lumbar spine," and "carpal tunnel syndrome, mild, resolved at present." He opined that Beckley was not precluded from performing any of the job duties of a CHP officer, including the 14 tasks, although he could suffer pain or discomfort from performing them.[4]

CalPERS concluded Beckley's application for disability retirement "must be measured against his usual duties as a PAO, not against the 14 critical tasks" and that there was no medical evidence Beckley was unable to perform his usual duties as PAO either when he applied for disability in 2006 or when he retired in 2008. On that basis, CalPERS denied his application.

Beckley brought a petition for writ of mandate in the trial court. The trial court granted the petition. The court prepared a statement of decision concluding CalPERS erred in measuring Beckley's disability against his assigned usual duties as a PAO, rather than against the usual duties of a CHP officer, including the 14 critical tasks, and that the

---

[3] In his report, Dr. Jacob stated that based on his musculoskeletal disorders, Beckley "would have difficulties with: [¶] Item 1: Lower extremity dynamic muscle strength anaerobic power. [¶] Item 2: Lower and upper extremity static and dynamic muscle strength aerobic power; ability to extract 200 pound victim from a vehicle. [¶] Item 3: Upper and lower extremity static and dynamic strength aerobic power. [¶] Item 5: Lower and upper extremity dynamic muscle strength aerobic power after 100 yard chase physically subdue and handcuff combative subject. Remove spilled loads or traffic hazards such as lumber, large rocks or sacks of heavy material from roadway. [¶] Item 11: Manual and finger dexterity. Load and fire, reload shotgun shells from a shotgun. Operate a mobile digital computer." These item numbers correspond to the 14 critical tasks. At the hearing, Dr. Jacob testified that Beckley could not perform those tasks.

[4] Beckley also claimed psychological disability and disability for tinnitus and hearing loss.

5

weight of the evidence showed Beckley was incapacitated for his performance of his duties.  The court entered judgment directing CalPERS (1) to set aside its decision denying Beckley's application for disability for retirement and (2) to grant the application.  Three weeks later, the court issued a peremptory writ of mandamus commanding CalPERS "to reconsider [its] action in light of this Court's Statement of Decision, and take further action especially enjoined on you by law."  This appeal ensued.[5]

## II.  STANDARD OF REVIEW

A public employee has a fundamental vested right to a disability pension if he or she is in fact disabled.  (*Quintana v. Board of Administration* (1976) 54 Cal.App.3d 1018, 1023 (*Quintana*).)  Accordingly, the trial court was authorized to apply its independent judgment as to the weight of the evidence.  (*Id.* at p. 1021.)  On appeal, we "need only review the record to determine whether the *trial court's* findings are supported by substantial evidence."  (*Id.* at p. 1024, italics added; see also *Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1185, fn. omitted (*Singh*).)  As to questions of law, we review those determinations de novo, although we give great weight to CalPERS's construction of the California Public Employees' Retirement Law (PERL) (Gov. Code,[6]

---

[5] The appeal purports to be from the writ of administrative mandamus.  "No appeal lies from a peremptory writ of mandate issued pursuant to a judgment."  (*C.R.W. v. Orr* (1970) 13 Cal.App.3d 70, 72, fn. 2; see also *Department of Transportation v. State Personnel Bd.* (2009) 178 Cal.App.4th 568, 575, fn. 3.)  The appeal rather lies from the judgment itself.  (See *Kindig v. Palos Verdes Homes Assn.* (1939) 33 Cal.App.2d 349, 355; *Demartini v. Department of Alcoholic Beverage Control* (1963) 215 Cal.App.2d 787, 794, disapproved on other grounds in *Harris v. Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589, 596; Code Civ. Proc., § 904.1.)  We shall exercise our discretion to deem the appeal to be from the judgment.  (See *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 21 [appeal from nonappealable order denying a new trial may be construed as an appeal from an existing final judgment].)

[6] All undesignated statutory references are to the Government Code.

§ 20000 et seq.). (*Molina v. Board of Administration, Etc.* (2011) 200 Cal.App.4th 53, 61; *O'Connor v. State Teachers' Retirement System* (1996) 43 Cal.App.4th 1610, 1620–1621.) If, however, there is "any ambiguity or uncertainty in the meaning of [the Public Employees' Retirement System] legislation [it] is to be liberally construed in favor of the public employee, as long as such construction is consistent with the clear language and purpose of the statute." (*City of Martinez v. Workers' Comp. Appeals Bd.* (2000) 85 Cal.App.4th 601, 617.)

### III. DISCUSSION

Section 21151, subdivision (a) provides: "Any patrol, state safety, state industrial, state peace officer/firefighter, or local safety member incapacitated for the performance of duty as the result of an industrial disability shall be retired for disability, pursuant to this chapter, regardless of age or amount of service." The PERL defines " '[d]isability' " and " 'incapacity for performance of duty' " to mean "disability of permanent or extended and uncertain duration, as determined by the board, . . . on the basis of competent medical opinion." (§ 20026.)

CalPERS contends these statutes mean that Beckley was eligible for disability retirement only if he was substantially unable to perform his " 'usual duties,' " and that those duties should be measured based on the requirements of his job as a PAO. For this, CalPERS relies on *Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873 (*Mansperger*) and *Hosford v. Board of Administration* (1978) 77 Cal.App.3d 854 (*Hosford*). We examine each, in turn.

The applicant in *Mansperger* was a fish and game warden who had suffered work-related injuries to his right arm that prevented him from lifting and carrying heavy loads. (*Mansperger*, *supra*, 6 Cal.App.3d at p. 875.) He remained able to perform most of his usual duties, including apprehending a prisoner, but could not lift heavy weights or carry the prisoner away. (*Ibid.*) CalPERS concluded he was not physically incapacitated from performing his duties as a fish and game warden. The trial court denied his petition for

7

writ of mandate, and the Court of Appeal affirmed.  (*Id*. at pp. 874, 877.)  The court held that "to be 'incapacitated for performance of duty' within [former] section 20122 means the *substantial* inability of the applicant to perform his usual duties."[7]  Although the applicant was not able to lift or carry heavy objects, the evidence showed he "could substantially carry out the normal duties of a fish and game warden.  The necessity that a fish and game warden carry off a heavy object alone is a remote occurrence."  (*Id*. at pp. 876–877.)  Because the applicant could carry out most of his duties, CalPERS and the trial court properly found he was not " 'incapacitated for the performance of duty' " within the meaning of the statute, and he was therefore not entitled to disability retirement.  (*Id*. at p. 877.)

The court in *Hosford* reached a similar result.  The applicant there was a CHP sergeant who had sustained injuries, including back injuries, in three separate incidents. (*Hosford*, *supra*, 77 Cal.App.3d at pp. 856–857.)  As a result, he experienced continuing pain, and believed he was in danger of further injury when he had to overpower people who resisted arrest.  (*Id*. at p. 857.)  CalPERS determined he was not incapacitated for his duties as a traffic officer.  The applicant petitioned for a writ of mandate, and the trial court, exercising its independent judgment, found he was " 'substantially able to perform the normal duties of a sergeant in the California Highway Patrol,' " and denied the petition.  (*Id*. at p. 859.)  The Court of Appeal concluded that substantial evidence supported the trial court's determination.  (*Id*. at pp. 859, 865.)  In considering the nature of the applicant's " '*usual* duties,' " the court rejected the contentions that those duties should be determined exclusively by use of either a job description prepared by the State Personnel Board or a document prepared by the CHP describing the typical physical

---

[7] Former section 21022, a predecessor to section 21151, provided "[a]ny patrol or local safety member incapacitated for the performance of duty as the result of an industrial disability shall be retired for disability, pursuant to this chapter, regardless of age or amount of service."  (*Mansperger*, *supra*, 6 Cal.App.3d at p. 876.)

8

demands on traffic officers and sergeants. The court noted that a sergeant's supervisory role meant both that he might need to make arrests and subdue prisoners and that he would be subjected to such physical demands less frequently than would traffic officers. (*Id*. at pp. 860–861.) In concluding the evidence supported the trial court's finding, the Court of Appeal noted that sitting for long periods of time would probably bother the applicant's back, but that did not mean he was *unable* to do so, particularly since he could stop and exercise as needed. (*Id*. at p. 862.) As to more strenuous activities, such as running and apprehending a fleeing suspect, the court relied on "[t]he rarity of the necessity for such strenuous activity, coupled with the fact that Hosford could actually perform the function." (*Ibid*.)

CalPERS argues that under *Mansperger* and *Hosford*, Beckley is entitled to disability retirement only if he is substantially unable to perform the usual duties of the position he most recently held as a PAO, whether or not he could perform the general duties of a CHP officer. We disagree. These cases do not hold that the usual duties of a job should be measured only by the applicant's last job assignment. Instead, both cases measured those duties in terms of the job classification the applicant held (fish and game warden in *Mansperger* and CHP traffic sergeant in *Hosford*). This approach makes sense: As the trial court in the case before us pointed out, "[t]ying an applicant's entitlement to disability retirement to his last specific assignment would tend to lead to highly inconsistent results for persons in identical job categories who suffer from identical disabilities."

Moreover, this approach is undercut by Vehicle Code section 2268, which was enacted in 1983, after *Mansperger* and *Hosford* were decided. (Stats. 1983, c. 1004, § 1, p. 3552.) As pertinent here, that statute provides: "(a) Any member of the Department of the California Highway Patrol . . . shall be capable of fulfilling the complete range of official duties administered by the commissioner pursuant to Section 2400 and other critical duties that may be necessary for the preservation of life and property. Members

9

of the California Highway Patrol shall not be assigned to permanent limited duty positions which do not require the ability to perform those duties. [¶] . . . [¶] (c) Nothing in subdivision (a) entitles a member of the California Highway Patrol to, or precludes a member from receiving, an industrial disability retirement." Thus, under Vehicle Code section 2268, a CHP officer must be able to perform all of the job duties of an officer—and there appears to be no dispute between the parties that the "14 critical tasks" reflect those duties.

This case is similar in many ways to *Thelander v. City of El Monte* (1983) 147 Cal.App.3d 736 (*Thelander*). The employee there, a probationary police officer for a city's police department, was injured while attending police training academy. Her employment was terminated because of her inability to complete the police academy and perform the required duties of a police officer. (*Id*. at pp. 739–740.) She later sought industrial disability retirement, and the city concluded she was not incapacitated for the performance of her duties as a police officer within the meaning of the PERL law. (*Id*. at p. 741.) The trial court granted the employee's petition for writ of mandate, and the Court of Appeal affirmed the judgment. (*Id*. at pp. 741–742, 749.) The court noted that there was evidence that every city police officer was "required to operate at the same level as a field officer regardless of her assigned position. This admission negates El Monte's contention that a distinction exists between the daily requirements of the job and the rare strenuous activities that may occasionally be involved. *If every officer must be capable of and prepared for the worst everyday, then that is a 'usual' duty of the job*." (*Id*. at p. 742, italics added.) Moreover, completing police academy was a requirement of the job of a police officer. The court reasoned: "The training requirement is analogous to the periodic health and performance tests a police department might require permanent officers to pass in order to retain their positions on the force. *Would a police department be allowed to terminate an industrially injured officer on grounds she failed a required annual physical examination or performance test yet deny her a disability pension*

10

*because she was 'capable' of performing the 'usual' duties of the job? Pretty clearly not.*" (*Id*. at p. 745, italics added.) The court also noted that no light duty assignment, or assignment that did not require the completion of police academy training, was available to the officer on a permanent basis. (*Id*. at p. 746.)

Similarly, under Vehicle Code section 2268, a CHP officer must be capable of carrying out "the complete range of official duties," and may not be assigned to permanent light duty assignments that do not require those capabilities. (Veh. Code, § 2268, subd. (a).) As part of the job description of an officer, the CHP has enumerated the "14 critical tasks" an officer must be able to carry out in order to perform those duties. Beckley's position as PAO was not considered a light duty assignment, and he was discharged because he was not able to perform all of the 14 tasks. This evidence amply supports the conclusion that—as was the case in *Thelander*—the ability to perform all tasks required of a CHP officer is part of the "usual" duties of his job.

CalPERS argues that Vehicle Code section 2268 does not affect the rule of *Mansperger* and *Hosford*, and that it is still entitled to consider only the duties an individual CHP officer actually was performing when deciding a disability claim. But as mentioned above, these cases did not establish a rule that employees' usual duties were to be established by their last assignment instead of their job classification. And section 2268, which was enacted after *Mansperger* and *Hosford* were decided, makes clear that all CHP members, regardless of job classification, must be capable of performing the

11

complete range of duties administered by the Commissioner, which—the parties do not dispute—include the 14 tasks.[8]

CalPERS contends, nevertheless, that its position is supported by subdivision (c) of Vehicle Code section 2268, which provides: "Nothing in subdivision (a) entitles a member of the California Highway Patrol to, or precludes a member from receiving, an industrial disability retirement." According to CalPERS, this provision means that, regardless of the clear language of subdivision (a), it has sole and complete authority to make a disability determination based on a CHP officer's individual job duties. We disagree with the notion that subdivision (c) requires CalPERS to measure a CHP officer's usual duties by looking to his or her last assignment. When read as a whole, it is clear that the statute establishes that the "usual duties" of every CHP officer include, by legislative mandate, the ability to carry out all tasks necessary for the preservation of life and property, but that an officer's *inability* to accomplish those tasks does not require a finding that the officer sustained an *industrial* disability (compare §§ 21150 & 21151), or that his incapacity is "of permanent or extended and uncertain duration" (see § 20026), or that the officer meets any other proper requirements for entitlement to industrial disability retirement. These matters are for CalPERS to decide.

In its reply brief, CalPERS acknowledges that Beckley "admittedly was left in a difficult position by [CHP's] actions," but argues that it has exclusive authority to make

---

[8] Indeed, in a precedential decision in 2000, which it cites in its reply brief on appeal, CalPERS stated that it "has interpreted Vehicle Code section 2268(a) as defining the 'usual job duties' of respondent CHP members as being the complete range of duties set forth in Vehicle Code section 2400 and '*other critical duties that may be necessary for the preservation of life and property*.' [¶] . . . [¶] The test for determining whether a [State Traffic Sergeant] is entitled to a CalPERS disability is whether the official is substantially unable to perform his/her *full range of 'usual duties' as defined by Vehicle Code section 2268*." (*In the Matter of the Application for Reinstatement from Industrial Disability Retirement, Willie Starnes*, Case No. 2530, OAH No. L-1999060537, Jan. 22, 2000, italics added.) We take judicial notice of this precedential decision.

12

determinations of eligibility for disability retirement and that it is not bound by CHP's determinations about whether Beckley could perform his job. (See §§ 20026, 20125, 21153, 21154, 21156.) The question here, however, is not who makes the eligibility determination, but whether CalPERS applied the correct legal standards in doing so. We have concluded that it did not because it measured Beckley's usual job duties by considering only the duties he engaged in when he was assigned to be a PAO.

CalPERS also argues that, rather than relieving Beckley of his duties as a PAO because of his disability, CHP should have applied for disability retirement on his behalf. (§ 21153.) But regardless of whether CHP followed the correct procedure, CalPERS was required to apply the correct legal standards.

CalPERS also contends that as a result of its determination that Beckley was substantially able to perform his duties as a PAO, he is entitled to reinstatement with the CHP. This argument simply reinforces the problem with defining Beckley's "usual duties" based on his role as a PAO, when the law requires any CHP officer to be able to perform *all* of the duties necessary to protect life or property and does not permit limited duty assignments. CalPERS makes no effort to explain how CHP could reinstate an officer unable to perform all necessary duties in a manner consistent with section 2268. According to statute, Beckley's usual duties were not limited to those normally performed by a PAO.

Finally, CalPERS points out that Dr. Serra, the orthopedic surgeon appointed by CalPERS, examined Beckley and concluded he was not precluded from performing any of the job duties of a CHP officer, including the 14 tasks. CalPERS's decision, however, was not based on the factual conclusion that Beckley could perform all of a CHP officer's job duties, but on the legal conclusion that his usual duties should be measured against those of a PAO. In any case, the trial court made the factual finding that Beckley was incapacitated from performing all of the duties of a CHP officer, and we review the *trial court's* determination for substantial evidence. (See *Singh*, *supra*, 41 Cal.App.4th at

13

p. 1185; *Quintana*, *supra*, 54 Cal.App.3d at pp. 1023–1024.)  As we have explained, in addition to Dr. Serra's report and testimony, the record contains evidence from three chiropractors, all of whom examined Beckley and his medical records, and all of whom opined that Beckley was not able to carry out the full range of duties of a CHP officer. Although the trial court did not recite this medical evidence in its statement of decision, there is no indication that CalPERS objected to the statement of decision on this basis, and we will therefore imply findings in Beckley's favor that are supported by the record. (See *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 528–529; *In re Marriage of Arceneaux* (1990) 51 Cal.3d  1130, 1133–1134; Code Civ. Proc., § 634.)  Moreover, the record is undisputed that CHP directed Beckley to leave the workplace because of his inability to perform the 14 tasks.  The evidence is sufficient to support the trial court's factual finding that Beckley was unable to carry out the usual duties of a CHP officer.

## IV. DISPOSITION

The judgment is affirmed.[9]

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Humes, J.

_____

[9] As we have noted, the trial court's judgment directed CalPERS (1) to set aside its decision denying Beckley's application for disability for retirement and (2) to grant the application.  Thereafter, the writ of mandamus commanded CalPERS "to reconsider [its] action in light of this Court's Statement of Decision, and take further action especially enjoined on you by law."  CalPERS has not pointed out, or raised any argument about, the effect of the differing wording of the judgment and the writ of mandamus, and we express no opinion on the matter.

14

**CALIFORNIA COURT OF APPEAL**
**FIRST APPELLATE DISTRICT**
**DIVISION FOUR**


PERRY BECKLEY
v.
BOARD OF ADMINISTRATION OF CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM

A135418
Alameda County
Sup. Ct. No. RG11593721

BY THE COURT:

The request filed on December 16, 2013 by respondent that this court's November 27, 2013 opinion be certified for publication is granted.

The Reporter of Decisions is directed to publish said opinion in the Official Reports.


Date:  December 26, 2013

Perry C. Beckley v. Board of Administration of California Public Employees' Retirement System  (A135418)

Trial court:    Alameda County

Trial judge:   Hon. Evelio Grillo

Counsel:

Patricia Bertha Miles and Rory Jerome Coffey for Defendant and Appellant.

Law Offices of Linda Joanne Brown and Christopher Hayes Dahms for Plaintiff and Respondent.